Sebastian SHAUMYAN, et al.

v.

Shawn Mark O'NEILL, et al.

Civ. No. N–87–463(AHN).

United States District Court,
D. Connecticut.

June 27, 1989.

Joanne Faulkner, New Haven, Conn., for plaintiffs.

George A. Reilly, Jackson & Nash, Darien, Conn., for defendant Shawn Mark O'Neill.

Matthew E. Karanian, Halloran, Sage, Phelon & Hagarty, Hartford, Conn., for defendant Steven Rolnick.

Carl J. Amento, Armento, Kopetz & D'Angelo, New Haven, Conn., for defendant Sidetex Co., Inc.

Robert W. Allen, and Michael B. Dashjian, Tyler, Cooper & Alcorn, New Haven, Conn., for defendant New Haven Firefighters Credit Union.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

The plaintiffs in this 42 U.S.C. Section 1983 action are consumers who were sued in Connecticut state court by commercial entities for alleged breaches of contracts. At the inception of that litigation, the state court plaintiffs employed section 52–278e(a)(1) of the Connecticut General Statutes to obtain *ex parte* prejudgment attachments on the consumers' real property.[1] The federal court plaintiffs raise various constitutional challenges to the facial validity of that provision, which reads in relevant part:

> The court or a judge of the court may allow the prejudgment remedy to be issued by an attorney without hearing as provided in sections 52–278c and 52–278d upon verification by oath of the plaintiff or of some competent affiant, that there is probable cause to sustain the validity of the plaintiff's claim and (1) that the prejudgment remedy requested is for an attachment of real property....

Conn.Gen.Stat. Section 52–278e(a)(1). Before this court are the litigants' Rule 56, Fed.R.Civ.P., cross-motions for summary judgment. For the following reasons, the plaintiffs' motion is denied and the defendants' motions are granted.

### Background

The undisputed facts are easily summarized. In 1986 defendant Sidetex Company, Incorporated ("Sidetex") performed home improvements on property owned by plaintiffs Sebastian and Maria Shaumyan. The Shaumyans, unhappy with the quality of Sidetex's work, refused full payment until the work was completed in a satisfactory manner. In response Sidetex retained counsel, defendant Stephen Rolnick, and brought suit in state court, where it obtained a section 52–278e(a)(1) attachment on the Shaumyan's property. In state litigation distinct from the Sidetex/Shaumyan dispute, federal defendant New Haven Firefighters Credit Union ("Credit Union") sued federal plaintiff Edward Cacace for default on a 1985 promissory note. During that litigation, the Credit Union's attorney, defendant Shawn Mark O'Neill, used section 52–278e(a)(1) to secure an attachment on property owned by Cacace.

---

1. An attachment is one form of prejudgment remedy available under Connecticut law.

'Prejudgment remedy' means any remedy or combination of remedies that enables a person by way of attachment, foreign attachment, garnishment or replevin to deprive the defendant in a civil action of, or affect the use, possession or enjoyment by such defendant of, his property prior to final judgment but shall not include a temporary restraining order.

Conn.Gen.Stat. Section 52–278a(d).

According to the federal plaintiffs, section 52–278e(a)(1) is constitutionally infirm on fourteenth amendment due process and equal protection grounds. The complaint seeks monetary, injunctive, and declaratory relief; attorneys' fees; and costs. Each of the four defendants—Sidetex, Rolnick, the Credit Union, and O'Neill—is represented by separate counsel, and each has filed a motion for summary judgment. The defendants share several arguments in common. They insist that: (1) this court should abstain from exercising subject-matter jurisdiction over a matter more properly resolvable in the state court proceedings; (2) they have acquired qualified immunity from suit; and (3) section 52–278e(a)(1) contains no constitutional deficiencies. In addition, defendants Sidetex and Rolnick believe that their motions should be granted on mootness grounds.

### Discussion

To prevail on a Rule 56 motion, a movant must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The burden of demonstrating the absence of a genuine issue rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden does not shift when cross-motions are before the court: Each motion must be judged on its own merits. *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 314 (2d Cir.1981). In the instant matter, the parties are not in dispute as to any of the material facts; instead, they differ in their interpretations of the law applicable to the case. Because resolution of questions of law is uniquely a judicial function, the court finds that the

cross-motions have placed the disputed issues squarely before the court.[2]

### A. Abstention

The defendants argue that abstention by this court is proper under either the doctrine embodied in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or that contained in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (*"Colorado River"*). *Younger* abstention is appropriate, according to the defendants, because the State of Connecticut possesses important interests in securing and effectuating its judgments. In the alternative, *Colorado River* abstention is appropriate because it would promote conservation of judicial resources and comprehensive disposition of the controversies among the litigants in this federal suit. The plaintiffs counter that they are entitled to an independent assessment of their federal rights by a federal court.

#### 1. *Younger Abstention*

Drawing upon principles of equity, comity, and federalism, the *Younger* court held that a federal court should not enjoin a pending state criminal proceeding unless necessary to prevent imminent irreparable injury. 401 U.S. at 43–44, 91 S.Ct. at 750. These principles also support federal nonintervention in select civil matters ongoing in a state forum. Abstention in a civil setting is proper "if the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987). Important

**2.** In motions to dismiss brought at an earlier stage in this litigation, the defendants challenged allegations in the complaint about misuse and abuse of the *ex parte* prejudgment remedy available under section 52–278e(a)(1). According to the defendants, such allegations are not cognizable under 42 U.S.C. Section 1983 because they do not satisfy the under color of state law requirement for such actions. Relying on *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the court agreed with the defendants' position and

dismissed the misuse and abuse allegations as "private conduct that cannot be fairly attributed to the state." *Shaumyan v. O'Neill*, Civ. No. N–87–463(AHN), slip op. at 6 (D.Conn. June 21, 1988) ("Ruling on Motions to Dismiss"; filing no. 44). The defendants did not dispute the allegations that they were state actors when they invoked the aid of Connecticut judicial officials in pursuing the *ex parte* attachment remedy afforded by section 52–278e(a)(1). *Lugar* makes clear that state action is present under these circumstances.

state interests are present if the civil proceedings "bear a close relationship to proceedings criminal in nature," *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982), or if the "[p]roceedings necessary for the vindication of important state policies or for the functioning of the state judicial system also evidence the state's substantial interest in the litigation." *Id.* (citing *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977)). *See also Ohio Civil Rights Comm'n v. Dayton Christian Schools,* 477 U.S. 619, 628–29, 106 S.Ct. 2718, 2724, 91 L.Ed.2d 512 (1986) (federal court should not enjoin state civil rights enforcement); *Moore v. Sims,* 442 U.S. 415, 434–35, 99 S.Ct. 2371, 2382–83, 60 L.Ed.2d 994 (1979) (federal court should not intervene in state proceedings involving temporary removal of child in child-abuse context).

According to the defendants, important state interests are implicated in the instant matter because Connecticut's *ex parte* attachment procedure protects state court judgments by allowing advance security for judgments that may eventually be received. The defendants equate this state interest with that present in *Pennzoil.* There, the Court concluded that *Younger* abstention was necessary when Texaco raised various federal claims in a federal forum in an effort to enjoin Texas proceedings allowing the execution of a judgment before exhaustion of the state appellate process. 481 U.S. at 10–17, 107 S.Ct. at 1525–29. Finding that states possess an important interest in enforcing the orders and judgments of their courts, the Court held that federal challenges to the processes by which states compel compliance with their judgments are impermissible:

> Not only would federal injunctions in such cases interfere with the execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained. So long as those challenges relate to pending state proceedings, proper respect for the ability of state courts to resolve federal questions presented in state court litigation mandates that the federal court stay its hand.

*Id.* at 14, 107 S.Ct. at 1527.

Notwithstanding the defendants' argument that *Pennzoil* is dispositive of the abstention issue, the court concludes that *Younger* abstention is inappropriate in the instant dispute. As noted, *Pennzoil* involved enforcement of a judgment, the kind of state interest that warrants nonintervention. Here, however, invocation of the prejudgment relief authorized by section 52–278e(a)(1) does not implicate interests that are vital to the operation of state government. The defendants in this federal forum employed the *ex parte* attachment procedure to secure assets of the plaintiffs on claims that may or may not result favorably for the defendants. Moreover, the attachments were ancillary to the underlying breach of contract claims. The court is hard pressed to identify the vital state interests present in relatively simple creditor/debtor disputes involving private parties. In the case at bar, the plaintiffs have invoked federal jurisdiction under a civil rights act to prevent the federal defendants from utilizing a state statute in a manner that allegedly violates constitutional rights. Heeding the maxim that abstention from the exercise of federal jurisdiction is the exception, not the rule, *see Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244, the court concludes that *Younger* abstention is not required here.

Another factor supports nonintervention by this court. *Younger* abstention is appropriate only if there are pending state judicial proceedings. *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 237–38, 104 S.Ct. 2321, 2327–28, 81 L.Ed.2d 186 (1984) (citing *Middlesex County Ethics Comm.,* 457 U.S. at 432–37, 102 S.Ct. at 2521–24). Since oral argument on the summary judgment motions, plaintiffs' counsel has informed the court that the Sidetex/Shaumyan dispute in state court has concluded and that the Credit Union/Cacace matter, while ongoing, has been placed on a trial list. In both instances, "[t]he issues herein [in the cross-motions] were not raised in the state court

matters." Supplemental Memorandum in Support of Plaintiffs' Motion for Summary Judgment at 1. The court at present has no knowledge about whether the Credit Union/Cacace action has finished, and, if so, whether either case is on appeal. The ongoing proceedings requirement of *Younger* is satisfied if a party can raise constitutional claims during the state appellate process. *Middlesex County Ethics Comm.*, 457 U.S. at 435–36, 102 S.Ct. at 2522–23; *Juidice*, 430 U.S. at 337, 97 S.Ct. at 1218. Given the uncertain status of the state court litigation, no purpose would be served by delaying resolution of the constitutional issues raised in the federal forum.

### 2. *Colorado River Abstention*

■ In *Colorado River* the Court was faced with facts that did not fall within any of the previously-elucidated contours for abstention. The case involved a state court litigation about water rights and a concurrent federal suit on the same subject brought by the United States and several Indian tribes against some 1,000 defendants. In light of the special nature of the case, the Court created a limited class of "exceptional" cases in which "for reasons of wise judicial administration" and conservation of resources, a federal court should defer to parallel state proceedings. 424 U.S. at 818, 96 S.Ct. at 1246. The Court reaffirmed the *Colorado River* doctrine in *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14–16, 103 S.Ct. 927, 936–37, 74 L.Ed.2d 765 (1983) (*"Moses H. Cone"*), stressed the rarity of its application, and emphasized that a court's abstention analysis should be "heavily weighted in favor of the exercise of jurisdiction." *Id.* at 16, 103 S.Ct. at 937. The *Colorado River* Court identified four factors to be considered in the weighing process: (1) the assumption by either the federal or state court of jurisdiction over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; and (4) the order in which jurisdiction was obtained. 424 U.S. at 818, 96 S.Ct. at 1246. The *Moses H. Cone* Court added two further considera-

tions: (5) whether federal or state law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the federal rights of the party seeking to invoke federal jurisdiction. 460 U.S. at 23–27, 103 S.Ct. at 941–43.

Balancing of these enumerated factors is unnecessary in light of the circumstances before the court today. For a court to refrain from exercising jurisdiction under either the *Colorado River* or *Younger* doctrine, it is elemental that the state proceeding be concurrent with the federal one. As noted earlier, *see supra* section A.1., the court has found that there may be no ongoing state proceedings in the Sidetex/Shaumyan and Credit Union/Cacace matters and that the plaintiffs' federal claims are properly presented and within this court's subject matter jurisdiction.

The court turns to the merits of the cross-motions and first addresses the plaintiffs' fourteenth amendment due process challenge.

### B. Constitutional Challenges

#### 1. *Due Process*

Section 52–278e(a)(1) is part of the comprehensive prejudgment remedy scheme set forth in Conn.Gen.Stat. Sections 52–278e to 52–278n. Pursuant to these statutes a plaintiff may seek to obtain a prejudgment remedy either by way of the duly noticed hearing procedures contained in sections 52–278c and 52–278d or by way of the *ex parte* process specified in section 52–278e. All *ex parte* applications require "verification by oath of the plaintiff or of some competent affiant, that there is probable cause to sustain the validity of the plaintiff's claim...." *Id.* Section 52–278e(a). Probable cause has been summarized thusly:

> Proof of probable cause as a condition of obtaining a prejudgment remedy is not as demanding as proof by a fair preponderance of the evidence. The legal idea of probable cause is a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a man of ordinary caution, pru-

dence and judgment, under the circumstances, in entertaining it.'

*Ledgebrook Condominium Ass'n, Inc. v. Lusk Corp.*, 172 Conn. 577, 584, 376 A.2d 60, 64 (1977) (quoting *Wall v. Toomey*, 52 Conn. 35, 36 (1884)).

To invoke the statutory process of section 52–278e, the verified affidavit must contain factual rather than conclusory allegations. *Kukanskis v. Griffith*, 180 Conn. 501, 504–05, 430 A.2d 21, 23 (1980). Before granting an *ex parte* attachment, the court must find probable cause solely from the facts within the four corners of the affidavit. *Glanz v. Testa*, 200 Conn. 406, 409, 511 A.2d 341, 342 (1986). Section 52–278e also guarantees the defendant the opportunity for an "expeditious[ ]" postattachment hearing at which the prejudgment remedy will be dissolved unless the court concludes "that there is probable cause to sustain the validity of the plaintiff's claim. . . ." Conn. Gen.Stat. Section 52–278e(c). At such a hearing, the plaintiff may amplify the facts set forth in the affidavit by introducing supplementary evidence in support of its claim. *Glanz*, 200 Conn. at 409–11, 511 A.2d at 343–44. *See generally* Levine, *Probable Cause Hearings in Connecticut*, 63 Conn. B.J. 118 (1989).

According to the plaintiffs, section 52–278e(a)(1) is unconstitutional as written because "it allows prejudgment attachment . . . of real property with no advance notice or opportunity to be heard, without a showing of exceptional circumstances, and without a bond to protect against erroneous deprivations." Plaintiff's [sic] Memorandum in Support of Summary Judgment Seeking Declaratory and Injunctive Relief ("Plaintiffs' Memorandum") at 1. The defendants rely on a series of United States Supreme Court and Connecticut Supreme Court decisions in which the due process contours of prejudgment creditor-debtor relationships were explored. To place the plaintiffs' challenges to section 52–278e(a)(1) in proper perspective, a somewhat extended analysis of these decisions is necessary.

In a quartet of cases decided between 1969 and 1975, the United States Supreme Court considered the constitutional status of various prejudgment remedies to determine what process was required before a person could be deprived of property. In *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the Court struck down a Wisconsin statute that permitted the prejudgment garnishment of wages—"a specialized type of property presenting distinct problems in our economic system"—without prior notice and a hearing. *Id.*, 395 U.S. at 340, 89 S.Ct. at 1822. A creditor could obtain a wage garnishment without demonstrating a lien or prior interest in the personal property attached; moreover, the garnishment could be acquired without judicial supervision. Finding that "a prejudgment garnishment of the Wisconsin type may as a practical matter drive a wage-earning family to the wall," the Court held that garnishing wages to safeguard a creditor's interest is constitutionally impermissible absent notice and opportunity for a prior hearing. *Id.* at 341–42, 89 S.Ct. at 1822–23.

Three years later the Court concluded in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), that prior hearings are a necessity for prejudgment attachment or replevin of personal property. The *Fuentes* Court invalidated Florida and Pennsylvania statutes that authorized sellers to repossess goods without judicial participation or orders. The Court also faulted statutes which provide inadequate postdeprivation procedures:

> If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred.

*Id.* at 81–82, 92 S.Ct. at 1994–95. The *Fuentes* Court also recognized, however,

that "[t]here are 'extraordinary situations' that justify postponing notice and opportunity for a hearing.... These situations, however, must be truly unusual." *Id.* at 90, 92 S.Ct. at 1999. Immediate seizure without notice may be necessary, for example, where a plaintiff demonstrates a special danger that the property is about to be concealed or destroyed so as not to be available to satisfy any judgment eventually rendered. But in the large majority of cases, " '[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' " *Id.* at 80, 92 S.Ct. at 1994 (quoting *Baldwin v. Hale,* 68 U.S. (1 Wall.) 223, 233, 17 L.Ed. 531 (1863)).

Debtors facing wage garnishments still enjoy the full protection of *Sniadach,* but the Court has retreated from its position in *Fuentes.* In *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the Court upheld a due process challenge to a Louisiana sequestration statute that allowed *ex parte* prejudgment deprivation of a debtor's property. A creditor seeking a writ under the statute had to present a fact-specific verified petition or affidavit to a judge, who was empowered to authorize the writ only after a "clear showing" and only after "the creditor seeking the writ has filed a sufficient bond to protect the vendee against all damages in the event the sequestration is shown to have been improvident." *Id.* at 605–06, 94 S.Ct. at 1899. Furthermore, the statute entitled the debtor to an immediate postseizure hearing where the writ would be dissolved unless the creditor could establish the grounds upon which the writ was issued. Failure to sustain this burden permitted the court to order return of the sequestered property and damages in favor of the debtor. *Id.* at 606, 94 S.Ct. at 1899. Last, the statute permitted the debtor to regain interim possession of the property by the filing of a substitute bond to protect the creditor. *Id.* at 607, 94 S.Ct. at 1900.

In seeking to accommodate the conflicting yet equally significant interests of debtors and creditors, the *Mitchell* Court concluded that when a debtor is protected by certain procedural safeguards, a sequestration or attachment statute is not facially unconstitutional if it lacks a provision requiring preseizure notice and hearing. *Id.* at 607, 610, & 616–17, 94 S.Ct. at 1900, 1904–05. The Court identified a number of such safeguards in the Louisiana statute that decreased the likelihood of an erroneous prehearing deprivation: (1) judicial review of a sworn, factual submission before a prejudgment order will issue; (2) the opportunity for the debtor to post a bond as a substitute for the sequestered goods; and (3) the right to an immediate postdeprivation hearing at which the creditor carries the burden of establishing grounds for the sequestration. *Id.* at 616–18, 94 S.Ct. at 1904–05. The Court summarized:

> [T]he Louisiana system seeks to minimize the risk of error of a wrongful interim possession by the creditor. The system protects the debtor's interest in every conceivable way, except allowing him to have the property to start with, and this is done in pursuit of what we deem an acceptable arrangement *pendente lite* to put the property in the possession of the party who furnishes protection against loss or damage to the other pending trial on the merits.

*Id.* at 618, 94 S.Ct. at 1905.

*North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), is the last, and arguably the most troublesome, case in the set. There, the Court reviewed a Georgia statute that permitted a creditor to garnish property after obtaining an *ex parte* writ issued by a court clerk on an affidavit containing conclusory allegations only. The statute also contained two bond provisions, one requiring a creditor to post a sum double the amount allegedly due, and the other conditioning dissolution of the writ on the debtor's acquisition of security in favor of the creditor. *Id.* at 603, 95 S.Ct. at 721. There was no provision for an "early hearing" once a garnishment had taken effect. *Id.* at 606, 95 S.Ct. at 722. After reviewing the three earlier cases, the *Di-Chem* Court found the Georgia law constitutionally "vulnerable for the same reasons" as those used to invalidate the Penn-

sylvania and Florida statutes at issue in *Fuentes. Id.* Though the *Di–Chem* Court apparently reinvigorated *Fuentes* to some degree, it also found that the Georgia statute possessed none of the "saving characteristics" of the statute scrutinized in *Mitchell. Id.* at 607, 95 S.Ct. at 722. Notwithstanding the presence of the double bond requirement, the *Di–Chem* Court criticized the conclusory nature of the affidavit triggering the garnishment procedure, the lack of judicial control over the process, the affirmative obligation of the debtor to file a bond to protect the creditor, and the absence of a provision for a prompt postseizure hearing. *Id.*

The four Court cases are the controlling authority in any analysis of the constitutionality of prejudgment remedies, but the lessons of the cases can appear unclear and contradictory. These "opinions have produced not only varying results, but differing analytical approaches to due process problems." *Jonnet v. Dollar Savings Bank,* 530 F.2d 1123, 1126 (3d Cir.1976). Attempts at reconciling the four cases have preoccupied numerous commentators for at least the last dozen years. In seeking to harmonize *Mitchell* and *Di–Chem,* and thereby formulate a procedural standard necessary for *ex parte* attachments, one commentator has postulated what he terms "atomistic" and "holistic" approaches. Note, *Creditors' Prejudgment Remedies and Due Process of Law—Connecticut's Summary Procedure Summarily Upheld: Fermont Division, Dynamics Corp. of America v. Smith,* 12 Conn.L.Rev. 174, 187 (1979) ("Note"). "The atomistic approach pieces together the individual procedural safeguards discussed in *Mitchell* and *Di–Chem* to form a checklist of specific provisions, all of which must be present in a

state statutory scheme for it to be constitutional." *Id.* By contrast, "[t]he holistic approach involves an ad hoc balancing test. Rather than examining a state statutory scheme to determine whether all of the 'other safeguards' are present, this approach considers the statutory system as a whole to determine whether it provides adequate protection to both parties." *Id.* at 188.

*Mitchell* and *Di–Chem* provide evidence supporting both types of analysis. In reviewing a state statute under the atomistic approach, a court could create a calculus that lists only the procedural safeguards present in *Mitchell* and found wanting in *Di–Chem:* judicial control of the *ex parte* process, an application grounded on specific facts rather than conclusory statements, and the opportunity for a prompt postdeprivation hearing. At least one member of the *Di–Chem* Court would require the addition of two other items to the checklist: a provision in the statute that the creditor provide security to the debtor before the writ issues, and one that the debtor be permitted to recover possession of the seized property by filing a substitute bond. In requiring these supplementary items, Justice Powell presumably drew upon the Louisiana and Georgia laws challenged in *Mitchell* and *Di–Chem,* respectively, both of which laws contained the additional safeguards.[3]

Support for a holistic standard emanates from the following passage in *Mitchell:*

> The requirements of due process of law 'are not technical, nor is any particular form of procedure necessary.' *Inland Empire Council v. Millis,* 325 U.S. 697, 710 [65 S.Ct. 1316, 1323, 89 L.Ed. 1877] (1945). Due process of law guarantees

---

3. According to Justice Powell,

> procedural due process would be satisfied where state law requires that the garnishment be preceded by the garnishor's provision of adequate security and by his establishment before a neutral officer of a factual basis of the need to resort to the remedy as a means of preventing removal or dissipation of assets required to satisfy the claim. Due process further requires that the State afford an opportunity for a prompt postgarnishment judicial hearing in which the garnishor has the

> burden of showing probable cause to believe there is a need to continue the garnishment for a sufficient period of time to allow proof and satisfaction of the alleged debt. Since garnished assets may bear no relations to the controversy giving rise to the alleged debt, the State also should provide the debtor an opportunity to free those assets by posting adequate security in their place.

*Di–Chem,* 419 U.S. at 611–12, 95 S.Ct. at 725 (Powell, J., concurring in the judgment).

'no particular form of procedure; it protects substantial rights.' *NLRB v. MacKay Co.*, 304 U.S. 333, 351 [58 S.Ct. 904, 913, 82 L.Ed.2d 1381] (1938). 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961); *Stanley v. Illinois,* 405 U.S. 645, 650 [92 S.Ct. 1208, 1212, 31 L.Ed.2d 551] (1972). Considering the Louisiana procedure *as a whole,* we are convinced that the State has reached a constitutional accommodation of the respective interests of buyer and seller.

*Mitchell,* 416 U.S. at 610, 94 S.Ct. at 1901 (emphasis added). In theory at least, *Mitchell* would seem to stand for the proposition that mandatory checklists of procedural safeguards are inappropriate. In practice, however, it would appear that courts have employed either some form of checklist or the balancing of interests approach:

> Although the federal circuit courts have been basically uniform in their use of an atomistic approach, a number of state courts have used a holistic approach. In some of these decisions, state courts have upheld statutes that clearly would have been struck down by a court using an atomistic model based on Justice Powell's concurring opinion in *Di–Chem.* Thus, no matter which analysis a state or federal court uses to uphold or strike down a prejudgment attachment statute, the possibility remains that a court on a different level could counter that decision by using the other analysis.

Note, 12 Conn.L.Rev. at 190 (and footnotes cited therein). Thus, no uniform rule has emerged concerning the general requirements necessary when analyzing *ex parte* prejudgment statutes for due process violations.

On several occasions the Connecticut Supreme Court has applied *Sniadach* and its progeny to state prejudgment statutes, including section 52–278e of the General Statutes. In *Roundhouse Constr. Corp. v. Telesco Masons Supplies Co.,* 168 Conn. 371, 362 A.2d 778, *vacated,* 423 U.S. 809, 96 S.Ct. 20, 46 L.Ed.2d 29 (1975) (remanded to consider whether court's judgment ground on fourteenth amendment, state constitutional provisions, or both), *aff'd on remand,* 170 Conn. 155, 365 A.2d 393 (earlier decision based on both federal and state constitutional grounds), *cert. denied,* 429 U.S. 889, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), the court struck down the state's mechanic's lien statute as violative of due process. After the property owners refused to make payments for construction work performed by the plaintiff, the latter filed a mechanic's lien on the property, as permitted by Connecticut statutory law. The property owners counterclaimed, raising a due process challenge to the lien procedures. After reviewing *Sniadach, Fuentes, Mitchell* and *Di–Chem,* the court noted that "the precise constitutional due process requirements in legal sequestration procedures have not as yet been definitively prescribed by the United States Supreme Court," but that "[t]he general requirements ... appear from an analysis of these cases...." 168 Conn. at 382, 362 A.2d at 783. The court then targeted four weaknesses in the lien procedures: (1) the party placing the lien was not required to post a bond or provide other surety to protect the property owner from an unsupportable lien; (2) the *ex parte* procedure could be carried out without being overseen by a judicial officer; (3) the lien certificate could contain conclusory statements only; and (4) "[m]ost conspicuously absent" from the scheme was any provision whatsoever for a timely pre or postdeprivation hearing. *Id.* at 382–83, 362 A.2d at 784. The mechanic's lien statutes did, however, permit an affected real estate owner to apply to the superior court for dissolution of the lien once a substitute surety bond had been procured. *Id.* at 375, 362 A.2d at 780.

Though it would appear that the *Roundhouse* court took an atomistic approach in analyzing the mechanic's lien procedures, the Court recognized the holistic standard as well. After noting that the *Di–Chem* decision had relied heavily on *Fuentes,* the court found that the *Fuentes* requirement of prior hearing and the *Di–Chem* use of

the phrase "early hearing" constituted a substantial difference between the two High Court cases:

> The clear indication now is that in testing whether a lien or sequestration procedure complies with the requirements of due process it will be examined in its entirety, and the lack of a provision for a prior hearing in and of itself will not be constitutionally fatal if other saving characteristics are present.

*Id.* at 380, 362 A.2d at 782–83.

Four years later the Connecticut Supreme Court addressed the procedural due process ramifications of section 52–278e. The plaintiff in *Fermont Div., Dynamics Corp. of Am., Inc. v. Smith,* 178 Conn. 393, 423 A.2d 80 (1979) (*"Fermont"*), obtained *ex parte* prejudgment remedies under the statute in a case involving non-payment for goods received. The plaintiff had based his application in part on Conn.Gen.Stat. Section 52–278e(a)(2)(F), which permits *ex parte* relief when there is "reasonable likelihood that the defendant ... has stated he is insolvent or has stated he is unable to pay his debts as they mature." [4] The defendant's motion to dissolve the remedies was denied, and on appeal the defendant challenged the constitutionality of the *ex parte* process.

In his appellate brief the defendant contended that section 52–278e was unconstitutional because it did not provide prediprivation notice and a hearing. The defendant also argued that section 52–278e(a)(2)(F) did not constitute one of the *Fuentes* "extraordinary situations" that would justify an *ex parte* writ. The defendant also believed *Mitchell* requires that a prejudgment statute contain a provision mandating preseizure filing of a bond by a creditor. *See* Note, 12 Conn.L.Rev. at 195

(citing Brief of Appellant–Defendant, *Fermont Div., Dynamics Corp. of Am. v. Smith,* 41 Conn.L.J. No. 3, at 12 (Sup.Ct. July 17, 1979)). Citing *Sniadach, Fuentes, Mitchell,* and *Di–Chem*—as well as two Connecticut cases, including *Roundhouse*—the *Fermont* court concluded that "[s]ection 52–278e complies with the due process standards developed by these cases." 178 Conn. at 397, 423 A.2d at 83. According to the court,

> [s]ection 52–278e exhibits all the saving characteristics that the law of procedural due process requires. The statute provides for adequate judicial supervision of the entire process of seizure, and does not permit writs to be issued by a court clerk. The statute can be invoked only by a verified affidavit that contains factual, rather than merely conclusory, supporting allegations. Most important, the statute affords to the defendant whose property has been attached the opportunity to obtain an immediate post-seizure hearing at which the prejudgment remedy will be dissolved unless the moving party proves probable cause to sustain the validity of his claim.

*Id.* at 397–98, 423 A.2d at 83. *Accord Sellner v. Beechwood Constr. Co.,* 176 Conn. 432, 434, 407 A.2d 1026, 1028 (1979) (section 52–278e "enacted in response to the constitutional instructions of *Fuentes* ... and *Sniadach*....."). Significantly, the *Fermont* Court found all of section 52–278e constitutional, not just the one subsection directly before the court. In addition, two federal courts in this district have recently deflected constitutional challenges to the facial validity of section 52–278e. *See Pinsky v. Duncan,* 716 F.Supp. 58, 60 (D.Conn.1989) (Eginton, J.) ("Viewed as a whole, [s]ection 52–278e(a)(1) comports

---

**4.** Section 52–278e(a)(2) of the General Statutes permits *ex parte* attachments and garnishments of personal property only when there is "reasonable likelihood" that the defendant

(A) neither resides in nor maintains an office or place of business in this state and is not otherwise subject to jurisdiction over his person by the court, or (B) has hidden or will hide himself so that process cannot be served on him or (C) is about to remove himself or

his property from this state or (D) is about to fraudulently dispose of or has fraudulently disposed of any of his property with intent to hinder, delay or defraud his creditors or (E) has fraudulently hidden or withheld money, property or effects which should be liable to the satisfaction of his debts or (F) has stated he is insolvent or has stated he is unable to pay his debts as they mature.

Conn.Gen.Stat. Section 52–278e(a)(2)(A) to (F).

with due process."); *Read v. Jacksen,* Civ. No. B–85–85, slip op. at 8, 1988 WL 163017 (D.Conn. Feb. 18, 1988) (Zampano, J.) ("Review of the Connecticut statute reveals that it was drafted with the dictates of due process, as the Supreme Court has articulated them, in mind.... The facial constitutional validity of [section] 52–278e ... stands beyond question....").

In 1980 the supreme court concluded that Connecticut's lis pendens statutes were unconstitutional on their face because they did not comply with the procedural due process requirements of the federal and state constitutions. In an action involving a specific parcel of real estate, the statutes permitted a litigant to record the pendency of the action in the town's land records; a subsequent purchaser was put on notice that he "shall be bound by all proceedings taken after the recording of such notice, to the same extent as if he were made a party to the action." Conn.Gen.Stat. Section 52–325 (now Conn.Gen.Stat. Section 52–325a). The court in *Kukanskis v. Griffith,* 180 Conn. 501, 509, 430 A.2d 21, 25 (1980), recognized that a notice of lis pendens implicates a significant property deprivation because it interferes with the alienability of real estate. The Connecticut statute was found wanting in several respects:

> The filing of a lis pendens requires no judicial action, no showing of probable cause and no notice to the defendant property owner. The party filing the lis pendens is not required to post a bond or provide any surety to protect the owner against damages from an unsupportable claim. No opportunity is provided to the owner either before or after the recording of the lis pendens to challenge its propriety. Moreover, no provision is made whereby the owner may apply for the dissolution of the lis pendens upon the substitution of a bond with surety.

*Id.* at 507, 430 A.2d at 24. This litany of defects is remarkably similar to the checklist of necessities Justice Powell formulated in his concurrence in *Di–Chem.*

The *Kukanskis* court drew parallels between the omissions in the lis pendens statutes and those in the mechanic's lien statute under attack in *Roundhouse.* After

citing *Sniadach* and the line of Court cases leading to *Di–Chem,* the court noted that while due process is determined by means of a "flexible test,"

> the Connecticut lis pendens statutes fail to provide even the barest minimum of due process protection. Most conspicuously absent is any provision whatsoever for any sort of a timely hearing, either before or after the recording of the notice of lis pendens, which would give the property owner an opportunity to be heard or require the party recording the notice to demonstrate in any way the probability of prevailing on the underlying action. The statutes allow the notice of lis pendens to continue indefinitely without any further action on the part of the party recording it, during which time the property owner is without recourse to the courts to contest the merits of the underlying claim.

*Id.* at 510, 430 A.2d at 25. Thus, the central fault with the lis pendens procedure was the absence of either a preseizure or prompt postseizure hearing provision.

Three years later the supreme court had the opportunity to review an amended version of the lis pendens procedure. In *Williams v. Bartlett,* 189 Conn. 471, 480–81, 457 A.2d 290, 294–95 (1983), the court found the procedure constitutionally sound. Presumably as a result of the *Kukanskis* decision, the Connecticut legislature amended Conn.Gen.Stat. Section 52–325 in 1981 to provide for a postnotice hearing at the prompting of the affected property owner: "The court or judge shall thereupon order reasonable notice of [the property owner's] application to be given to the plaintiff and shall set a date or dates for the hearing or hearings to be held thereon.... At least seven days notice shall be given to the plaintiff prior to the date of such hearing...." Conn.Gen.Stat. Section 52–325a(a). At any hearing, the plaintiff carries the burden of establishing that "there is probable cause to sustain the validity of his claim." *Id.* section 52–325b(a). Notably, the amended procedure contains no bonding provisions, either requiring a plaintiff to post security for an

improvident recording or permitting a defendant to substitute security to obtain release of the lis pendens.

In upholding the constitutional validity of the amended procedure, the *Williams* court emphasized that due process "is a flexible doctrine, requiring 'such procedural protections as the particular situation demands.'" 189 Conn. at 477, 457 A.2d at 293 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). The court also revealed that the statutes at issue in *Roundhouse* and *Kukanskis* were constitutionally infirm *only* because they lacked hearing provisions. *Id.*, 189 Conn. at 478, 457 A.2d at 293. The *Williams* court also reaffirmed its conclusion in *Kukanskis* that notice of lis pendens constitutes a sufficient property deprivation so as to invoke the federal and state protections of procedural due process. *Id.* at 478 n. 5, 457 A.2d at 293 n. 5. In reviewing the post-*Kukanskis* lis pendens statute for the procedural safeguards prescribed by due process, the *Williams* court was guided by the tripartite test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976), which requires the balancing of (1) the private interests affected; (2) the risk of an erroneous deprivation of such interests by the procedures being challenged, coupled with the probable value of additional or substitute safeguards; and (3) the governmental interests, including the additional fiscal and administrative burdens which would be created by different procedural safeguards. 189 Conn. at 477, 457 A.2d at 293.

In considering the first prong of the *Mathews* test, the *Williams* court concluded that the property deprivation caused by the recording of a notice of lis pendens "is at all times nonpossessory" with a "de minimis" effect "unless the property owner has any intention of alienating or mortgaging the realty . . . ." *Id.* at 479, 457 A.2d at 294. By contrast, however, a plaintiff's interest in the process is more palpable:

[A] notice of lis pendens ensures that the plaintiffs' claim cannot be defeated by a prejudgment transfer of the property. Because of the uniqueness of real estate, this function is particularly important where the complaint seeks specific performance relative to the affected property. Even where the plaintiff seeks only recovery of funds allegedly invested in the burdened real estate, or where the plaintiff asserts a partial ownership interest therein, the lis pendens procedure provides security for payment of the claim pending final resolution of the case.

*Id.* at 479–80, 457 A.2d at 294. The court next addressed the third *Mathews* prong, finding that the state possessed a legitimate interest in the challenged provisions because the legislature had created a specific procedure by which "the rights of third-party purchasers are readily defined." *Id.* at 480, 457 A.2d at 294. According to the court, " '[i]f the power of the courts to determine the rights of the parties to real property could be defeated by its transfer, *pendente lite*, to a purchaser without notice, additional litigation would be spawned and the public's confidence in the judicial process could be undermined.'" *Id.* (quoting *Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316, 1329 (3d Cir.1982)). The *Williams* court also concluded that the risk of an erroneous deprivation of property interests—i.e., the second prong of the *Mathews* equation—was eliminated because the statute afforded a "prompt post-filing hearing . . . ." 189 Conn. at 480, 457 A.2d at 294.

Upon weighing the statute's "limited effect" on the realty owner, the greater interests of the plaintiff and the state, and the absence of a risk of erroneous deprivation, the *Williams* court held that the notice of lis pendens procedure "meets the minimum requirements of procedural due process" under the federal and state *constitutions*. *Id.* at 480–81, 457 A.2d at 294–95. In their attack on the amended lis pendens procedure, the appellants in *Williams* had criticized the lack of a provison allowing the substitution of a bond or other security for a release of the lis pendens notice. The *Williams* court summarily dismissed the bond argument in a footnote: "[W]e do not construe the absence of a bonding provison

as rendering the statute constitutionally infirm. Indeed, because of the uniqueness of real property, substituting security to obtain the release of a lis pendens might impair the adequacy of the remedy for the successful litigant." *Id.* at 481 n. 6, 457 A.2d at 295 n. 6 (citation omitted).

With this protracted but relevant groundwork in place, the court turns to the plaintiffs' specific due process challenges to section 52–278e(a)(1).

The Connecticut Supreme Court did not employ the three-part *Mathews* test, used for probing the lis pendens procedure at issue in *Williams,* when reviewing section 52–278e in *Fermont. Mathews* articulates the proper framework for analyzing what procedural safeguards are necessary in a due process context. Instead, the *Fermont* court limited its inquiry to the saving characteristics purportedly present in the provision. By engaging in this narrow search the court implicitly answered in the affirmative the threshold question of whether a real estate attachment is a deprivation of an interest protected by the fourteenth amendment. It is elementary that procedural due process is triggered only if there has been a deprivation of a significant property interest. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Unless this court agrees with the panel in *Fermont* that the realty attachment authorized by section 52–278e(a)(1) constitutes a constitutionally-protected taking, there will be no need to discuss what due process is necessary under *Mathews.*

In the four Court cases synopsized earlier, the deprivation resulting from the application of the particular prejudgment remedy was clearly tangible. In *Sniadach* the *ex parte* garnishment procedure allowed up to 50% of a debtor's wages to be frozen until the conclusion of the litigation. 395 U.S. at 338 & n. 1, 89 S.Ct. at 1821 & n. 1. Similarly, the garnishment statute under attack in *Di–Chem* permitted a creditor to effect the impoundment of a debtor's bank account pending resolution of the creditor's claim. 419 U.S. at 606, 95 S.Ct. at 722. In *Fuentes* the prejudgment procedure authorized replevy of a consumer's household goods if the creditor held a security interest in the goods. 407 U.S. at 69–72, 92 S.Ct. at 1988–90. And in *Mitchell* a writ of sequestration issued pursuant to the Louisiana statute permitted a court official to take physical possession of the merchandise in question until the suit was completed. 416 U.S. at 602, 94 S.Ct. at 1897.

Lower courts faced with prejudgment real estate attachment statutes have reached divergent conclusions about whether such impairments are cognizable takings under the fourteenth amendment. Admittedly, such attachments are nonpossessory in that the debtor does not forfeit possession and use of the property while his title is encumbered. Furthermore, the defendant is not precluded from alienating the property to a third party. On the other hand, there is no denying that an attachment impairs the marketability and mortgageability of the property by preventing the owner from conveying clear title while the litigation remains unresolved. *Fuentes* provides support for the proposition that procedural due process may be triggered by less than a total deprivation: "Any significant taking of property by the State is within the purview of the Due Process Clause." 407 U.S. at 86, 92 S.Ct. at 1997. *See also Sniadach,* 395 U.S. at 342, 89 S.Ct. at 1823 ("Since this deprivation cannot be characterized as *de minimis,* [the debtor] must be accorded the usual requisites of procedural due process....") (Harlan, J., concurring).

■ In *In re Northwest Homes of Chehalis, Inc.,* 526 F.2d 505 (9th Cir.1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976), the ninth circuit upheld Washington's nonpossessory real estate attachment provision because the notice of attachment did " 'nothing more than impinge upon economic interests of the property owner.' " 526 F.2d at 506 (quoting *Spielman–Fond, Inc. v. Hanson's, Inc.,* 379 F.Supp. 997, 999 (D.Ariz.1973) (three-judge court), *summarily aff'd,* 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974)). *Accord In re The Oronoka,* 393 F.Supp. 1311, 1317 (D.Me.1975). Notwithstanding

this conclusion the more convincing view of prejudgment real estate attachments is that they involve a significant property interest shielded by the fourteenth amendment. In *Terranova v. Avco Fin. Services of Barre, Inc.*, 396 F.Supp. 1402, 1406–07 (D.Vt.1975), the three-judge court succinctly summarized the scope of the issue:

With a real estate attachment, defendants maintain, there is really no property deprivation at all, no 'taking,' so to speak, because the landowner still has what is referred to as the 'full use and occupancy of the property.' Plaintiffs maintain that there is a significant property interest involved in a real estate attachment since it may adversely affect the landowner's credit rating, and in addition make it difficult or impossible for the landowner to sell or mortgage the property.

In deciding this threshold question, we cannot ignore the substantial economic effects which can result from the use of the real estate in connection with the initiation of a suit. The attachment in question places a burden upon the real estate owner, a burden which is underscored by the fact that he must take affirmative action in court in order to dissolve the attachment. This, in addition to the fact that an attachment impairs the market value and marketability or mortgageability of the real estate cannot be viewed as 'insignificant' deprivations in a constitutional sense. Notwithstanding the fact that such effects may be only temporary, they are nevertheless real. While the ownership of property cannot be simply defined nor its rights easily compartmentalized, consisting as it does of a collection of benefits, uses and duties, an attachment involves the curtailment of economically important property uses.

Two years later the same three-judge panel reaffirmed this reasoning: "In *Terranova* we held that a nonpossessory attachment, while it may involve a somewhat lesser interference with property rights, does constitute a cognizable interference with property rights that are amenable to constitutional protection.... We ... are disposed to follow our former reasoning." *Briere v. Agway, Inc.*, 425 F.Supp. 654, 659 (D.Vt. 1977). *Accord Bay State Harness Horse Racing & Breeding Ass'n v. PPG Indus., Inc.*, 365 F.Supp. 1299, 1304–05 (D.Mass. 1973) (three-judge court). This court finds the reasoning of *Terranova* persuasive and concludes that the real estate attachment procedure allowed under section 52–278e(a)(1) is a deprivation of property under the fourteenth amendment.

The threshold hurdle vaulted, the court now considers whether section 52–278e(a)(1) complies with due process. In navigating this course, two fundamentals guide the court's inquiry. First, due process " 'is not a technical conception with a fixed content unrelated to time, place and circumstances,' " *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961) (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162–63, 71 S.Ct. 624, 643–44, 95 L.Ed. 817 (1951)), but a "flexible" doctrine "call[ing] for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Second, the circumstances of any particular situation are to be explored within the latticework of the *Mathews* balancing test. The initial area of inquiry involves consideration of the respective interests of the debtor and creditor. Only in that way can the court determine whether section 52–278e(a)(1) "reach[es] a constitutional accommodation of the respective interests" of the creditor and debtor. *Mitchell*, 416 U.S. at 610, 94 S.Ct. at 1901.

▉ Before applying *Mathews*, however, a fundamental question needs answering: Whether a distinction exists between personalty and realty in terms of fourteenth amendment due process. Put another way, this court must decide whether the *ex parte* real estate attachment procedure authorized under section 52–278e(a)(1) is entitled to the same due process review that pertains to the *ex parte* procedure for personal property attachments and garnishments. The Court has yet to rule on the

constitutionality of prejudgment remedies involving real estate; the line of cases from *Sniadach* to *Di–Chem* involved personal not real property. In *Fuentes* and *Di–Chem,* however, there are indications that the Court would not distinguish among various types of property in applying the due process clause.

Justice Stewart, in his majority opinion in *Fuentes,* recognized that there may be gradations in the importance or necessity of seized consumer goods, but he emphasized that

> if the root principle of procedural due process is to be applied with objectivity, it cannot rest on such distinctions. The Fourteenth Amendment speaks of 'property' *generally.* And, under our free-enterprise system, an individual's choices in the marketplace are respected, however unwise they may seem to someone else. It is not the business of a court adjudicating due process rights to make its own critical evaluation of those choices and protect only the ones that, by its own lights, are 'necessary.'

407 U.S. at 90, 92 S.Ct. at 1999 (emphasis added). In a footnote accompanying this segment, Justice Stewart expanded on this principle: "The relative weight of liberty or property interests is relevant, of course, to the form of notice and hearing required by due process.... But *some* form of notice and hearing—formal or informal—is required before deprivation of a property interest that 'cannot be characterized as *de minimis.'* " *Id.* n. 21 (citing *Sniadach,* 395 U.S. at 342, 89 S.Ct. at 1823 (Harlan, J., concurring)) (emphasis in original). In *Di–Chem,* Justice White wrote the majority opinion in a case where the dispute arose outside the consumer context. Though the matter dealt with a prejudgment garnishment statute in a commercial setting and with parties of equal bargaining power, Justice White concluded that "[w]e are no more inclined now than we have been in the past to distinguish among different kinds of property in applying the Due Process Clause." 419 U.S. at 608, 95 S.Ct. at 723 (citing *Fuentes,* 407 U.S. at 89–90, 92 S.Ct. at 1998–99). Though the *Fuentes* and *Di–Chem* Courts did not specifically mention

real property, some lower courts have drawn upon the words of Justices Stewart and White to support the conclusion that no distinction among types of property should be made when applying due process. *See, e.g., MPI, Inc. v. McCullough,* 463 F.Supp. 887, 894–95 (N.D.Miss.1978). This court discerns no reason for the creation of different due process standards as to personalty and realty.

An attachment of real estate under section 52–278e(a)(1) does not constitute as onerous a deprivation of property as seizures authorized by the statutes under review in *Sniadach, Fuentes, Mitchell,* and *Di–Chem.* In those cases the defendants were deprived of the full use and enjoyment of their personal property—wages, bank accounts, and household goods. A real estate owner adversely affected by the attachment procedure at issue here continues to enjoy the physical use of the property free from any cloud imposed by the attachment. That cloud on the title, however, is nonetheless "real" and "cannot be viewed as [an] 'insignificant' deprivation[ ] in a constitutional sense." *Terranova,* 396 F.Supp. at 1406–07. The interest created by such an encumbrance operates as a superior interest against subsequent purchasers and thus restricts, for all practical purposes, the alienability of the property. In addition, an attachment may impact negatively on an owner's credit rating and impair his or her ability to secure additional financing for the property. The degree of limitation varies considerably, though, depending upon the owner's plans with respect to the real estate. Obviously, an owner who has no intention of alienating or mortgaging the land during the litigation will suffer less harm than an owner with a present intention of transferring the property. Because the life span of a lawsuit is rarely susceptible to prediction, the latter owner may readily sense the "curtailment of [an] economically important property use[ ]." *Id.* The fact that the owner can "expeditiously" be heard on dissolution of the attachment, or substitute other surety for the encumbrance, *see infra,* would seem irrelevant when considering the ex-

tent of the debtor's interest. As the Court has made clear, the temporal nature of the property deprivation does not diminish the degree of the impingement. *See Fuentes,* 407 U.S. at 86, 92 S.Ct. at 1997. ("The Fourteenth Amendment draws no bright lines around three-day, 10–day or 50–day deprivations of property.")

From the opposite perspective, section 52–278e(a)(1) allows a creditor to mark an asset of the debtor with the creditor's brand so that in the event a judgment is rendered for the plaintiff, some or all of that asset can be used to satisfy the judgment. As with the interests of a debtor, a creditor's interests vary with the facts of a particular case. For example, when a creditor seeks to employ the provision to secure an interest in property that is the subject of the underlying claim, the creditor's interest is arguably more cognizable than when the connection between the encumbered res and cause of action is attenuated or nonexistent.

Under the second prong of the *Mathews* framework, a court must consider the risk of erroneous deprivation of the property interest by the procedures being challenged, coupled with the probable value of additional or substitute safeguards. On its face, section 52–278e contains all of the procedural safeguards highlighted by the *Mitchell* and *Di–Chem* Courts. *Ex parte* attachments under the statute may issue only after judicial review of a sworn affidavit that contains factual rather than conclusory allegations establishing probable cause of the validity of the plaintiff's claim. Moreover, the defendant "may move to dissolve or modify the prejudgment remedy granted pursuant to this section in which event the court shall proceed to hear and determine such motion *expeditiously.*" Conn.Gen.Stat. Section 52–278e(c) (emphasis added).[5] At the hearing on the defendant's motion, the burden of proof as to probable cause rests at all times with the plaintiff. The prejudgment remedy scheme also permits a defendant to post a security bond, in an amount to be determined by a judge, to restore the affected property to its unencumbered state. *Id.* Section. 52–278*l* (d).

■ These saving characteristics mimic all but one of the safeguards Justice Powell would require in a prejudgment remedy statute. *See supra* footnote 3 and accompanying text. The plaintiffs in the instant proceeding argue that the remaining safeguard—the posting of a creditor's bond to indemnify a debtor for an improvident attachment—is a mandatory constant in any due process equation. The Connecticut prejudgment remedy scheme does not require a creditor to post such a bond. The court recognizes that some federal courts have concluded that, for an attachment statute to pass constitutional muster, "the creditor must post a bond and be liable for any damages resulting from a wrongful attachment." *Watertown Equip. Co. v. Norwest Bank Watertown, N.A.,* 830 F.2d 1487, 1493 (8th Cir.1987) (citing *Mitchell,* 416 U.S. at 610, 617, 618–19, 94 S.Ct. at 1901, 1905–06). As the court has previously stated, however, *Mitchell* does not sweep so broadly, at least when analyzed within a holistic frame of reference. Furthermore, in the *Watertown Equip. Co.* case the court relied on an eleventh circuit opinion, *Jones v. Preuit & Mauldin,* 822 F.2d 998 (11th Cir.1987), as reinforcement for the due process centrality of a creditor's bond. The *Jones* court also strongly supported the proposition that a debtor's financial interest must be adequately protected against wrongful attachment, but the court recognized an option to the preseizure posting of a creditor's bond. A debtor's interest would be protected "either via the posting of a bond by the creditor who seeks the writ, *or by allowing an action for damages suffered as a result of a wrongful attachment." Id.* at 1002 (em-

---

5. Section 52–278e does not provide on its face a specific time frame within which the hearing must be held. This omission is not constitutionally suspect, however. The Louisiana statute upheld in *Mitchell* spoke only of the entitlement to an "immediate hearing." 416 U.S. at 606, 94 S.Ct. at 1899. The word "expeditiously" is not defined in the General Statutes, but it would seem sufficiently synonymous with 'immediate,' or 'prompt'—or even "early," the modifier used before "hearing" in the text of the *Di–Chem* opinion. 416 U.S. at 606, 94 S.Ct. at 1899.

phasis added). Though not part of the prejudgment remedy chapter, a provision in the Connecticut General Statutes provides for the recovery of damages for groundless or vexatious suits: "Any person who commences and prosecutes any civil action or complaint against another ... (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages." Conn.Gen.Stat. Section 52–568(a). While it is not entirely clear how section 52–568(a) would work in the prejudgment remedy context, the provision seemingly provides a debtor with a remedy for wrongful attachment.

The Connecticut prejudgment remedy scheme has two additional safeguards worth mentioning. Section 52–278e requires that after an *ex parte* prejudgment remedy is granted, the plaintiff must include in the process served on the defendant notice about certain rights available to the defendant under the prejudgment remedy procedures. The specific rights include:

(1) The right to a hearing to object to the prejudgment remedy for lack of probable cause to sustain the claim; (2) The right to a hearing to request that the prejudgment remedy be modified, vacated or dismissed or that a bond be substituted; and (3) the right to a hearing as to any portion of the property attached which you claim is exempt from execution.

Conn.Gen.Stat. Section 52–278e(b). The second feature of note is that an order granting or denying a motion to dissolve brought under section 52–278e "shall be deemed a final judgment for purposes of appeal." *Id.* Section 52–278*l* (a). Thus, either a debtor or a creditor can obtain prompt appellate review of an unfavorable decision at a dissolution hearing.

Viewing the prejudgment remedy scheme "as a whole," *see Mitchell,* 416 U.S. at 610, 94 S.Ct. at 1901, the court concludes that the procedural safeguards available under and in conjunction with section 52–278e minimize the risk of an erroneous deprivation of a debtor's property rights.

While the lack of a creditor's bond requirement is a procedural defect in the scheme, it is one that should properly be raised with the General Assembly since most statutes have such a provision, and does not rise to the level of a constitutional infirmity.

Under the last prong of the *Mathews* three-part test, the court must assess the state's interest in the challenged procedure. That interest seems minimal at best. Often the acquisition of an *ex parte* real estate attachment is ancillary to the underlying claim. Moreover, the state is not usually a party to the process. Typically, the cases involve private parties in creditor/debtor disputes. To the extent that the property has a direct nexus to the merits of the suit, the state's interest is arguably enhanced, though not to the degree present in a lis pendens situation. There, the res is always the subject of the litigation and the notice of lis pendens binds the rights of third-party purchasers to the outcome of the suit. As the Connecticut Supreme Court noted in *Williams,* the state has a legitimate interest in assuring that the res is not alienated because any prejudgment transfer would more than likely spawn additional litigation. 189 Conn. at 480, 457 A.2d at 294. That concern is not present in the real estate attachment procedure available under section 52–278e(a)(1). Though alienability may as a practical matter be adversely affected from the parties' perspectives, the state, through its courts, has no significant interest in securing the encumbered property until judgment is rendered.

In the light cast by the *Mathews* balancing test, the court concludes that section 52–278e(a)(1), as written, comports with the requirements of fourteenth amendment due process. While true that an *ex parte* real estate attachment is a significant property deprivation, the nonpossessory lien is not so substantial a deprivation that it cannot be neutralized by the postdeprivation procedural safeguards available to a real property owner under the prejudgment remedy scheme. Those safeguards afford a debtor ample protection against erroneous or arbitrary attachments and represent a fair accommodation

of the respective interests of a creditor and debtor.[6]

## 2. *Equal Protection*

█ The plaintiffs also raise a fourteenth amendment equal protection challenge to section 52–278e(a)(1). According to the plaintiffs, "[o]nly the real property owner can have property attached without prior notice in non-emergency situations in conjunction with the inception of a lawsuit. Defendants who do not own real property are not subject to such an attachment." Plaintiffs' Memorandum at 22. The plaintiffs contend that strict scrutiny of section 52–278e(a)(1) "is warranted because it impinges on fundamental rights of property ownership and access to courts." *Id.* at 23. The defendants do not address the equal protection claim. Nevertheless, the court finds that the *ex parte* real estate attachment procedure authorized by section 52–278e(a)(1) does not on its face violate the equal protection clause.

The equal protection clause requires that "'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920)). However, "'[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *Plyler*, 457 U.S. at 216, 102 S.Ct. at 2394 (quoting *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)). State legislatures possess initial discretion in determining what is similar and what is different:

A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

*Plyler*, 457 U.S. at 216, 102 S.Ct. at 2394.

Though not expressly stated, the plaintiffs appear to find constitutionally suspect the distinctions made in sections 52–278e(a)(1) and 52–278e(a)(2) of the General Statutes. Section 52–278e(a)(1) allows *ex parte* attachments of realty on any pretext, so long as probable cause to sustain the validity of the plaintiff's claim is present; conversely, section 52–278e(a)(2) permits *ex parte* attachments and garnishments of personalty in six particularized circumstances only. See *supra* note 4 for the text of Conn.Gen.Stat. Section 52–278e(a)(2)(A) to (F). The narrowly drawn nature of subsection (a)(2) and the broad nature of subsection (a)(1) may be at least partially explained by the different circumstances surrounding their separate enactments. In *Lynch v. Household Fin. Corp.*, 360 F.Supp. 720, 723–24 (D.Conn.1973), a three-judge court in this district court struck down Connecticut's garnishment statute as violative of the notice and hearing requirements of *Sniadach* and

---

**6.** The plaintiffs press the argument that *Fuentes* requires extraordinary situations before predeprivation notice and a hearing can be forsaken. Though *Di–Chem* rejuvenated *Fuentes* in some immeasurable way, the *Di–Chem* Court tempered the holding of the earlier decision: "Because the official seizures [in *Fuentes* ] had been carried out without notice and without opportunity for a hearing *or other safeguard against mistaken repossession* they were held to be in violation of the Fourteenth Amendment." *Di–Chem*, 419 U.S. at 606, 95 S.Ct. at 722 (emphasis added). Clearly, after *Di–Chem*, the focus of the inquiry becomes whether adequate alternative safeguards are present to prevent mistaken sei-

zures of property. The court in *Cristiano v. Courts of the Justices of the Peace*, 669 F.Supp. 662, 669 (D.Del.1987), would answer the plaintiffs' argument this way:

Although the predeprivation 'extraordinary situation' exception has been noted by courts there has been no meaningful discussion of what the term means. It appears to be a conclusion rather than the starting point of the analysis. The proper approach is to apply the general balancing test described in *Mathews v. Eldridge* to determine whether a prior hearing is necessary, and if not, then the situation can be labeled 'extraordinary.'

*Fuentes.* [7] Significantly, *Lynch* predated *Mitchell* and *Di–Chem.* Following *Lynch*, the Connecticut legislature sought to remedy the constitutional defects in the garnishment statute by enacting "An Act Concerning Prejudgment Remedies," 1973 Conn. Acts 431 ("Act") (now codified at Conn. Gen.Stat. Sections 52–278a and 52–278n). The section of the Act comprising section 52–278e(a) then consisted of what is today section 52–278e(a)(2)(A) to (F) and applied to both real and personal property. It was not until 1976—i.e., *after Mitchell* and *Di–Chem* were decided—that the legislature added section 52–278e(a)(1). *See* 1976 Conn. Acts 401, section 2.

The legislative history supporting subsection (a)(2) is fairly extensive and makes clear that the Act was implemented in consideration of *Lynch, Sniadach,* and *Fuentes. See* 16 Conn.H.R.Proc., pt. 12, 1973 Sess. 5837–88 (May 10, 1973). Given that *Fuentes* was then at its precedential zenith, it is not surprising that subsection (a)(2) reflects the *Fuentes* Court's emphasis on the need for exceptional circumstances before predeprivation notice and a hearing could be excused. *See supra* section B. 1. In stark contrast, the legislative history underpinning subsection (a)(1) is conspicuously sparse. *See, e.g.,* Joint Standing Comm. Hearings (Judiciary), pt. 1, 1976 Sess. 82–86 (Feb. 17, 1976). There is no mention of how the amendment originated, and it was summarily approved by both chambers of the General Assembly.

Notwithstanding the lack of constitutional exegesis behind the genesis of subsection (a)(1), the provision easily survives an equal protection challenge. Real property owners are not a suspect class, nor is clear title on realty a fundamental right that deserves strict scrutiny under the equal protection clause. Rather, subsections (a)(1) and (a)(2) essentially involve economic rights. As a general rule, "[w]hen social or economic legislation is at issue, the Equal Protection Clause allows the States

wide latitude ... and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 441, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). Such legislation "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (citations omitted). As noted earlier in the due process portion of this ruling, *see supra* section B. 1, real estate attachment is, in most instances, a less burdensome form of property deprivation than attachment of a debtor's household goods or garnishment of his or her wages or bank account. Moreover, the state has a legitimate interest in providing a creditor with a means for insuring that there will be property available to satisfy the judgment if the plaintiff prevails on the underlying claim. Section 52–278e(a)(1) is rationally related to that legitimate interest. The debtor is not displaced from the use and possession of the realty during the pendency of the suit and can employ a variety of postdeprivation procedural safeguards to protect his or her interests. In short, section 52–278e(a)(1)—and the attendant prejudgment remedy scheme—strikes a considered balance between the equally significant interests of creditors and debtors. The court perceives no equal protection flaw in the provision under scrutiny.

Because section 52–278e(a)(1) passes both due process and equal protection muster, there is no need for the court to address the defendants' qualified immunity and mootness arguments.

### Conclusion

For the foregoing reasons, the court denies the plaintiffs' motion for summary judgment and grants the defendants' cross-motion. The Clerk of the Court is directed

---

7. The case had originally been dismissed by the district court for lack of jurisdiction, *see Lynch v. Household Fin. Corp.,* 318 F.Supp. 1111 (D.Conn.1970), but eventually was remanded to the district court by the United States Supreme Court. *Lynch v. Household Fin. Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

to enter summary judgment, pursuant to Rule 56, Fed.R.Civ.P., for the defendants.

SO ORDERED.